# EXHIBIT D

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| FREEDOM ORDNANCE MFG., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:16-cv-243 |
| | ) | |
| THOMAS E. BRANDON | ) | |
| DIRECTOR | ) | |
| BUREAU OF ALCOHOL TOBACCO | ) | |
| FIREARMS AND EXPLOSIVES, | ) | |
| | ) | |
| Defendant. | ) | |

**AFFIDAVIT OF MICHAEL WINGE**

I, Michael Winge, being duly sworn according to law, do depose and state as follows:

1. I am one of the owners of Freedom Ordnance Manufacturing, Inc. ("Freedom").

2. Freedom is manufacturer based out of Chandler, Indiana and is engaged in the business of manufacturing firearm accessories.

3. Freedom designed an Electronic Reset Assist Device ("ERAD") for commercial sale to the general public.

4. The ERAD is a firearm accessory that, when attached to a firearm, assists in the reset of a firearm's trigger after the trigger has been pulled by the firearm's user.

5. The ERAD is composed of a mechanism that floats inside the raceway of the trigger housing and which rides on a cam that is attached to the electric motor in the grip housing. As the motor turns, the cam lobe pushes the trigger reset bar forward.

6. The ERAD does not continually engage the trigger during its operation.

1

7. Instead, the ERAD engages the trigger finger which, when consciously and deliberately pulled, engages the trigger.

8. The sole function of the ERAD is to push the trigger finger forward when the firing sequence is initiated, rather than pull the trigger rearward.

9. Because it is a completely self-contained system that does not engage the hammer or disconnector.

10. Once the user consciously and deliberately pulls the trigger and simultaneously engages the electric switch, the ERAD activates the trigger finger reset mechanism, and the reset bar applies only forward tension to the trigger finger.

11. The ERAD cannot under any circumstances apply rearward tension to the trigger finger, the trigger itself, and/or any other part of the operating mechanism. Thus, the shooter pulls the trigger sufficiently to activate the firing sequence, and the trigger finger reset bar then propels the trigger finger forward away from the firearm trigger, actually clearing the trigger such that the trigger moves fully forward and there is a gap between the reset bar and the trigger itself.

12. The ERAD does not alter the trigger, hammer, and disconnector of a firearm in any way, and such continue to function exactly as originally designed.

13. Because the shooter is consciously and deliberately applying rearward pressure to fire the firearm, the shooter must similarly overcome the forward pressure of the trigger finger reset bar to fire the weapon.

14. As long as the shooter continues to apply conscious and deliberate rearward pressure to the reset bar, it will continue to fire one shot per pull of the trigger.

15. The trigger finger reset bar is not the trigger, nor can it activate the firing sequence.

16. Only the shooter's conscious and deliberate pull of the reset bar that subsequently engages the trigger that causes the weapon to fire and the ERAD cannot be made to function any other way.

17. The ERAD is merely a trigger finger reset device that is neither affixed to the trigger nor can function on the trigger. It simply pushes the shooter's trigger finger off of the trigger allowing the natural reflex of pulling the trigger to happen in a more rapid movement.

18. Freedom submitted samples of the ERAD along with videos and other materials to ATF's Firearms Technology Industry Services Branch ("FTISB") as part of an evaluation request seeking confirmation that the ERAD is neither a firearm nor a machinegun as defined under applicable law.

19. By letter dated October 27, 2016, FTISB issued a determination that the ERAD constitutes a machinegun, determining that the ERAD is "a combination of parts designed and intended solely and exclusively for use in converting a weapon into a machinegun and thus a 'machinegun' as defined in 26 U.S.C. 5845(b)." A true and accurate copy of FTISB's letter of October 27, 2016 is attached hereto as Exhibit A.

20. The FTISB letter of October 27, 2016 demonstrates that FTISB failed to articulate a satisfactory explanation for its classification and failed to examine the relevant data. FTISB concluded erroneously and against the evidence that the ERAD is "a combination of parts designed and intended solely and exclusively for use in converting a weapon into a machinegun and thus a 'machinegun' as defined in 26 U.S.C. 5845(b)."

21. Contrary to FTISB's determination, the ERAD is not "a combination of parts designed and intended solely and exclusively for use in converting a weapon into a machinegun and thus a 'machinegun' as defined in 26 U.S.C. 5845(b)." Rather, a semi-automatic firearm equipped with the ERAD continues to fire only as a result of backward force by the operator's trigger finger, and still only fires one shot for each single function of the trigger.

22. FTISB's erroneous classification of the ERAD as a "machinegun" has caused substantial and possibly irreparable harm to Freedom.

23. Prior to embarking on the ERAD project, Freedom sought the opinions of both legal and industry experts to confirm that the ERAD would be designed in a way that would not make it a "machinegun" under Federal Law.

24. As a result of FTISB's erroneous classification and production delays occasioned thereby, Freedom's employees have endured salary cuts, postponement of raises, and the lack of bonuses for overtime and high production marks that they would have earned had the ERAD been in production.

25. At least one key employee has left Freedom because of production delays occasioned by FTISB's erroneous classification, and others are likely to follow in the near future.

26. Proper classification of the ERAD by FTISB would likely result in the immediate addition of four good-paying jobs at Freedom as well as the ability to bring current employees compensation up to competitive industry-level rates.

27. The ERAD project was funded by seven blue-collar families who invested over $150,000 of their hard-earned funds and have since had to take a line of credit to cover wages and expenses while challenging FTISB's erroneous classification.

\* \* \* \* REMAINDER OF PAGE INTENTIONALLY LEFT BLANK \* \* \* \*

_____
Michael Winge

STATE OF INDIANA          )
                          )  SS:
COUNTY OF WARRICK         )

Sworn to and subscribed in my presence on this 16th day of March, 2017.

DEIDRA MICHELLE ROSE
Seal
Notary Public - State of Indiana
Warrick County
My Commission Expires Nov 12, 2023

_____
NOTARY PUBLIC

5