UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| FREEDOM ORDNANCE MFG., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:16-cv-243-RLY-MPB |
| | ) | |
| THOMAS E. BRANDON, Director, | ) | |
| Bureau of Alcohol Tobacco Firearms | ) | |
| and Explosives, | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT AND IN
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Freedom Ordnance Manufacturing, Inc. ("Freedom") is a firearms manufacturer
headquartered in Chandler, Indiana.    In this case, Freedom challenges a decision by the Bureau
of Alcohol, Tobacco, Firearms, and Explosives ("ATF") that a device Freedom seeks to
manufacture and market is a "machinegun" as defined under the National Firearms Act, 26
U.S.C. § 5845(b).    ATF's decision is not arbitrary and capricious, but is supported by the
administrative record.    Based on the foregoing, ATF is entitled to summary judgment.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE[1]

Freedom Ordnance Manufacturing, Inc. ("Freedom") is a federally-licensed firearms manufacturer with its principle place of business in Chandler, Indiana.   (Docket No. 1 ¶ 2.) Freedom designed an Electronic Reset Assist Device ("ERAD") for commercial sale to the general public.   (Docket No. 1 ¶ 9.)   The purpose of the ERAD, as described by Freedom, is to "improve firearm design" to assist the firearm user's "ability to continually pull the trigger in a rapid manner when a high rate of fire is desired."   (Administrative Record ("AR") 0025; Patent documents.)

The Firearms and Ammunition Technology Division ("FATD") of ATF, through its Firearms Technology Industry Services Branch ("FTISB"), provides expert technical support to ATF, other Federal agencies, State and local law enforcement, the firearms industry, Congress, and the general public.   ATF, Firearms Ammunition and Technology (2017), available at https://www.atf.gov/firearms/firearms-and-ammunition-technology.   FTISB is responsible for technical determinations concerning types of firearms approved for importation into the United States and for rendering opinions regarding the classification of suspected illegal firearms and newly designed firearms.   *Id.*

There is no requirement in the law or regulations for a manufacturer to seek an ATF classification of its product prior to manufacture.   *See* Bureau of Alcohol, Tobacco, Firearms and Explosives, National Firearms Act Handbook 7.2.4 (2017), available at

---

[1] As discussed in Legal Background, Section D, the typical Fed. R. Civ. P. 56 standard and procedural structure does not apply in an APA review case.   Accordingly, the Defendant is not required to marshal evidence showing material issues of fact in dispute and the typical "Statement of Material Facts Not In Dispute" does not apply, but is offered for factual context. Specific sections of the Record are cited in the relevant portions of the Argument section.

https://www.atf.gov/firearms/national-firearms-act-handbook.    ATF, however, encourages

firearms manufacturers to submit devices for classification before they are offered for sale to

ensure that the sale of such devices would not violate the Federal firearms laws and regulations.

*Id.*    ATF responds to classification requests with letter rulings that represent "the agency's

official position concerning the status of the firearms under Federal firearms laws."    *Id*. at

7.2.4.1.

### A.    The November 2015 Submission

In November 2015, Freedom submitted a request to FTISB to examine a "trigger reset

device."    (AR 0002; 0005 – 17 (photos of submission).)    Freedom submitted a prototype of the

device, along with correspondence, and a Bushmaster Model XM15-E2S AR-type firearm to be

used in testing the prototype.    (*Id.*)

FTISB closely examined and tested the prototype.    (AR 0003.)    As part of the

examination, FTISB staff fired an AR-type rifle[2] with the prototype attached.    (*Id.*)    FTISB

staff noted two instances of machinegun function with the prototype device attached.    (*Id.*)

Specifically, FTISB found that trigger reset device, when attached to the test weapon, converted

it into a weapon that fired automatically – "firing more than one shot without manual reloading

by a single function of the trigger."    (*Id.*)    Based on the examination and testing conducted,

FTISB determined that the trigger reset device was a "machinegun" as defined in 26 U.S.C. §

5845(b), and notified Freedom in a letter dated March 23, 2016.    (AR 0002 – 4.)

### B.    The April 2016 Submission and October 27, 2016 Classification Decision

---

[2] FTISB ended up using an ATF AR-type firearm to field test the prototype device because it
noted a deformity in the Bushmaster Model XM15-E2S AR-type firearm submitted by Freedom.
(AR 0003.)

3

In April 2016, Freedom submitted a new sample prototype of its trigger reset assist device (referred to as the "ERAD").   (AR 0001.)   According to Freedom, the new sample prototype "is a total redesign" of the initial prototype.   (AR 0001.)   In the submission, Freedom included two sample prototypes of the device, along with 9-volt lithium batteries, and DVDs showing demonstrations of live firing and disassembly of the device.   (*Id.*)   Although Freedom did not explicitly request a classification from FTISB on its prototype, FTISB treated the submission as such because the letter referred back to the Agency's March 23, 2016, classification and stated that Freedom "worked very hard to correct" the issues identified in the March 23, 2016, letter.   (*Id.*)

On or about September 7, 2016, Freedom submitted a supplemental letter to FTISB in support of its April 2016 request for classification of the ERAD.   (AR 0018 – 24.)   The supplemental materials included a letter from Freedom's counsel setting forth Freedom's position that the ERAD should not be classified as a machinegun.   (AR 0018 – 24.)   The supplemental materials also included a sixteen minute demonstration video of the ERAD, and written materials, including Freedom's purported patent application for the ERAD.   (AR 0018; AR0025 – 46.)   In the video, Freedom states that the ERAD permits the shooter to discharge 450 to 500 rounds per minute.   (AR 0047.)

FTISB examined that submission and supplemental materials, including the demonstration video.   (AR 0070 – 71.)   Specifically, FTISB disassembled and examined the two sample ERAD prototypes.   (*Id.*)   FTISB examined each component part of the ERAD and its design features and characteristics.   (AR 0071 – 72.)   FTISB staff also conducted field testing of the ERAD by attaching it to and firing from commercially-available Remington and

4

PMC rifles and a Bushmaster Model XM15-E2S AR-type firearm.   (AR 0072.)   During the test-fire portion of the examination, staff observed machinegun function six times.   (*Id.*) Specifically, FTISB personnel observed that a single pull of the ERAD trigger - designated as the "primary trigger" - initiated the firing sequence, which caused firing until the trigger finger was removed.   (AR 0073.)

By letter dated October 27, 2016, FTISB issued a classification on Freedom's ERAD trigger system.   (AR 0070 - 82.)   In the eleven-page letter, FTISB described (1) the composition of the trigger and grip assembly, including its several constituent parts; (2) FTISB's process for examining and testing the ERAD trigger system; (3) its observations of the ERAD trigger system functionality and the firing effect that was produced when the ERAD was applied to a firearm (*i.e.*, the prototype sent by Freedom) and test-fired; and (4) a breakdown of the firing sequence with and without the ERAD, including several accompanying illustrations.   (*Id.*)

FTISB concluded that the ERAD is properly classified as a machinegun.   Significantly, FTISB found that "the firing sequence is initiated by a pull of the primary trigger and perpetuated *automatically* by shooter's constant pull and the reciprocating, battery-powered metal lobe repeatedly forcing the primary trigger forward."   (AR 0073.)   Thus, "[a] single pull of the trigger by the shooter therefore starts a firing sequence in which *semiautomatic* operation is made *automatic* by an electric motor."   (*Id.*)   FTISB found that because the shooter does not have to release the trigger for subsequent shots to be fired, the firing sequence is continually engaged as long as the shooter maintains constant rearward pressure (a pull) on the trigger and the motor continues to push the shooter's finger forward.   (*Id.*)   In other words, as long as the trigger is depressed, the firearm continues to fire until either the trigger finger is removed, the

firearm malfunctions, or it runs out of ammunition.   (*Id.*)

FTISB therefore concluded that the installation of an ERAD on a semiautomatic firearm causes that firearm to shoot automatically (through the automatic functioning made possible by the electric motor), more than one shot, by a single function (a single constant pull) of the trigger.   FTISB therefore properly concluded that the ERAD is classified as a combination of parts designed and intended for use in converting a semiautomatic rifle into a machinegun under 26 U.S.C. § 5845(b).   (AR at 79-80; 80-82.)

### THE COURT MUST STRIKE AND DISREGARD
### FREEDOM'S EXTRA-RECORD EVIDENCE

Freedom brings its claim under the Administrative Procedure Act, 5 U.S.C. § 704, challenging ATF's decision that Freedom's ERAD device be classified as a machinegun. (Docket No. 1; Docket No. 24.)   As discussed further below, review of the agency's decision under the APA is conducted using an arbitrary and capricious standard, and the Court's review is limited to the administrative record lodged by the agency.   *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985) ("The task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court."); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("That review is to be based on the full administrative record that was before the Secretary at the time he made his decision."), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Highway J Citizens Grp. v. Mineta,* 349 F.3d 938, 952 (7th Cir. 2003) ("the reviewing court considers only the administrative record already in existence, not some new record made initially [in that court].").

In support of its motion for summary judgment, Freedom submitted the declarations of

Michael Winge (Pl.'s Ex. D, Docket No. 24-4) and Richard Vasquez (Pl.'s Ex. E, Docket No. 24-5).   Mr. Winge is one of the owners of Freedom Manufacturing.   (Pl.'s Ex. D, Docket No. 24-4.)   Several paragraphs of his declaration recount correspondence between FTISB and Freedom, which is already contained in the Administrative Record and which is the best evidence of its contents.   (See Pl.'s Ex. D, Docket No. 24-4, ¶¶ 18 – 20.)   The remaining paragraphs contain Mr. Winge's opinions about the ERAD and his arguments regarding why the ERAD should not be classified as a machinegun.   Mr. Winge's opinions are merely that – his opinions – and are not part of the official record containing the information upon which ATF relied in issuing its decision.   The Court should strike and disregard these opinions because the Court's review is limited to the administrative record lodged by ATF.   Freedom did not challenge or move to supplement that administrative record; therefore, it is complete.   *Highway J Citizens Grp.,* 349 F.3d at 952; *see also United States Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("a presumption of regularity attaches to [g]overnment agencies' actions."); *Spiller v. Walker*, No. A-98-CA-255-SS, 2002 U.S. Dist. Lexis 13194, *26-27 (W.D. Tex. July 19, 2002) ("any legal conclusions and post-[decision] evidence within the declarations and argumentation offered simply to contest the agencies' experts are not admissible.").

Richard Vasquez appears to be a witness who was retained by Freedom to provide his expert opinion regarding the ERAD's classification.   (Pl.'s Ex. E, Docket No. 24-5.)   Expert reports are generally not permitted in an APA review case.   *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 555 (1978) ("the role of a court in reviewing the sufficiency of an agency's consideration . . . is a limited one, limited both by the time at which the decision was made and by the statute mandating review.").   Both the Supreme Court and the Seventh Circuit

have emphasized that "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); *Cronin v. USDA*, 919 F.2d 439, 443 (7th Cir. 1990) ("it is imprudent for the generalist judges of the federal district courts and courts of appeals to consider testimonial and documentary evidence bearing on those questions unless the evidence has first been presented to and considered by the agency."); *see also Airport Cmtys Coal. v. Graves*, 280 F. Supp.2d 1207, 1213 (W.D. Wash. 2003) (holding that APA was intended to preclude "Monday morning quarterbacking").

The Vasquez Declaration simply criticizes the agency's analysis, but under the APA the Court must allow the agency to rely on its own experts' opinions even if a plaintiff has other expert opinions. *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989) ("When specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts, even if as an original matter, a court might find contrary views more persuasive."). Therefore, even if a so-called "expert" conclusion would contradict the agency's expert's conclusions, this Court can give it no force. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1335 (9th Cir. 1992).

Based on the foregoing, the Court must strike and disregard the Winge and Vasquez Declarations.

## LEGAL BACKGROUND

### A.  The National Firearms Act and Gun Control Act

The National Firearms Act of 1934, 26 U.S.C. Chapter 53, and the Gun Control Act of 1968, 18 U.S.C. Chapter 44, comprise the relevant federal framework governing the firearm

market.   The Gun Control Act generally makes it unlawful for a person to transfer or possess a machinegun manufactured on or after May 19, 1986.   18 U.S.C. § 922(o).   ATF is charged with administering and enforcing both the National Firearms Act and the Gun Control Act.   28 C.F.R. § 0.130(a)(1)–(2).

18 U.S.C. § 922(a)(4) states that it shall be unlawful –

(4) for any person, other than a licensed importer, licensed manufacturer, licensed dealer, or licensed collector, to transport in interstate or foreign commerce any destructive device, machinegun (as defined in section 5845 of the Internal Revenue Code of 1986), short-barreled shotgun, or short-barreled rifle, except as specifically authorized by the Attorney General consistent with public safety and necessity;

Accordingly, with the limited exception of State, Federal and local law enforcement agencies, it is unlawful for any person to transfer or possess a machinegun manufactured on or after May 19, 1986.   Moreover, machineguns must be registered in the National Firearms Registration and Transfer Record and may only be transferred upon the approval of an application.   26 U.S.C. § 5812.   The National Firearms Act makes it unlawful to manufacture a machine gun in violation of its provisions.   26 U.S.C. § 5861(f).   Specifically, the National Firearms Act requires that a person shall obtain approval from ATF to make a National Firearms Act firearm, which includes a machinegun. 26 U.S.C. §§ 5922, 5845(a).   Similarly, licensed manufacturers are required to notify ATF by the end of the business day following manufacture of a NFA firearm.   26 U.S.C. § 5841(c), 27 CFR 479.103.

**B.  The Definition of a Machinegun**

The National Firearms Act, 26 U.S.C. § 5845(b), defines a machinegun[3]  as

---

[3] Although more commonly spelled "machine gun," the applicable statutes use the spelling "machinegun."

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

*See also* 27 C.F.R. § 478.11 (stating same).

The Gun Control Act incorporates the National Firearms Act's definition of machinegun and defines machinegun identically to the National Forearms Act.    18 U.S.C. § 922(a)(4). Both statutory definitions of a machinegun therefore include a combination of parts designed and intended for use in converting a weapon into a machinegun.    *Id.*    This language includes a device that, when activated by a single pull of the trigger, initiates an automatic firing cycle that continues until the finger is released or the ammunition supply is exhausted.    *See* ATF Rule 2006-2 (AR at 630-32.)

### C.  The Administrative Procedure Act

The Administrative Procedure Act (APA) requires that the Court "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."    5 U.S.C. § 706(2)(A).    The "scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency."    *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).    The Court must be satisfied that the agency has "'examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Alpharma, Inc. v. Leavitt*, 460 F.3d 1, 6 (D.C. Cir. 2006) (quoting *State Farm*, 463 U.S. at 43).    The agency's decisions

are entitled to a "presumption of regularity," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401

U.S. 402, 415 (1971), and although "inquiry into the facts is to be searching and careful, the

ultimate standard of review is a narrow one," *id*. at 416.

      Federal courts are particularly deferential towards the "'scientific determinations'" of the

agency, which are "presumed to be the product of agency expertise." *Franks v. Salazar*, 816

F.Supp.2d 49, 55 (D. D.C. 2011) (quoting *Balt. Gas & Elec. Co. v. Natural Res. Def. Council,

Inc.*, 462 U.S. 87, 103 (1983)).   The Court's review is confined to the administrative record,

subject to limited exceptions not at issue here.   *See Camp v. Pitts*, 411 U.S. 138, 142 (1973)

("[T]he focal point for judicial review should be the administrative record already in existence,

not some new record made initially in the reviewing court.").   *See also Sig Sauer, Inc. v. Jones*,

133 F. Supp. 3d 364, 371 (D.N.H. 2015), *aff'd sub nom. Sig Sauer, Inc. v. Brandon*, 826 F.3d

598 (1st Cir. 2016) (recognizing that classification determinations "require expertise that is well

within the ATF's grasp" and that "its conclusions are entitled to substantial deference from a

reviewing court.") (citing *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989)).

### D.  Summary Judgment in APA Cases

      Under the APA, "courts are to decide, on the basis of the record the agency provides,

whether the action passes muster under the appropriate APA standard of review." *Fla. Power &

Light Co.*, 470 U.S. at 743-44.   Because extra-record evidence and trials are inappropriate in

APA cases, courts decide APA claims via summary judgment based on the administrative record

the agency compiles.   *Cronin*, 919 F.2d at 445 ("Because the plaintiffs are not entitled to present

evidence in court to challenge the [decision-maker's] decision . . . , there will never be an

evidentiary hearing in court."); *Nw. Motorcycle Ass'n v. USDA*, 18 F.3d 1468, 1472 (9th Cir.

1994).

Although summary judgment is the procedural mechanism by which the Government is presenting its case, the limited role federal courts play in reviewing such administrative decisions means that the typical Federal Rule 56 summary judgment standard does not apply.   *See Citizens for Appropriate Rural Roads, Inc. v. Foxx*, 14 F. Supp. 3d 1217, 1228 (S.D. Ind. March 31, 2014) (Barker, J.) (citing *Cronin*, 919 F.2d at 445); *see also Sierra Club v. Mainella*, 459 F.Supp.2d 76, 89–90 (D. D.C. 2006).   Instead, in APA cases, "[t]he factfinding capacity of the district court is thus typically unnecessary to judicial review of agency factfinding . . . .   [C]ourts are to decide, on the basis of the record the agency provides, whether the action passes muster under the appropriate APA standard of review."   *Florida Power & Light Co.*, 470 U.S. at 744–74.

## ARGUMENT

Plaintiff raises several challenges to FTISB's classification decision.   As discussed below, FTISB conducted a thorough examination of the ERAD, and fully disclosed the findings supporting its decision.   FTISB's decision was not arbitrary and capricious, but is supported by the facts as presented in the administrative record, and is a reasonable interpretation of the statute.   Defendant is entitled to judgment in its favor on all of the Plaintiff's claims.

### A.  ATF's Decision Is Not Arbitrary and Capricious.

A machinegun is defined in part as any weapon that shoots "automatically more than one shot, without manual reloading, by a single function of the trigger."   26 U.S.C. § 5845(b).   The term also includes any "combination of parts designed and intended, for use in converting a weapon into a machinegun."   *Id.*   In the definition of machinegun, neither the National

12

Firearms Act nor the Gun Control Act further define the phrase "single function of the trigger."

The test firing of Plaintiff's prototype—an AR-15 semi-automatic rifle (Bushmaster Model

XMI150E2S) with an integrated ERAD grip—demonstrated that, once the grip button was pulled

(activating the motor) concurrent with constant rearward pressure being applied to the trigger

extension (which Plaintiffs refer to as the "reset bar"), the weapon fired more than one shot

without manual reloading and without any additional action on the shooter's part.   Indeed, the

weapon fired continuously until the shooter stopped applying rearward pressure to the trigger

extension, or the ERAD's ammunition supply was exhausted.   (AR at 79, 47 (demonstration

video).)   Additionally, when equipped with the ERAD, the weapon fired at a very high rate of

speed, discharging up to 500 rounds per minute.   (AR 0047.)   Thus, the nature and mechanics

of the ERAD support FTISB's finding that it converted the semiautomatic firearm to a

machinegun.

FTISB's conclusion is consistent with the National Firearm's Act's legislative history, in

which the drafters equated "single function of the trigger" with "single pull of the trigger."   *See*

National Firearms Act: Hearings Before the Committee on Ways and Means, H.R. Rep. No.

9066, 73rd Cong., 2nd Sess., at 40 (1934) ("Mr. Frederick.[ ] The distinguishing feature of a

machine gun is that by a single pull of the trigger the gun continues to fire as long as there is any

ammunition in the belt or in the magazine.   Other guns require a separate pull of the trigger for

every shot fired, and such guns are not properly designated as machine guns.   A gun, however,

which is capable of firing more than one shot by a single pull of the trigger, a single function of

the trigger, is properly regarded, in my opinion, as a machine gun."); *see also* George C. Nonte,

Jr., Firearms Encyclopedia 13 (1973) (the term "automatic" is defined to include "any firearm in

13

which a single pull and continuous pressure upon the trigger (or other firing device) will produce rapid discharge of successive shots so long as ammunition remains in the magazine or feed device – in other words, a machinegun").

FTISB's decision is also consistent with the ordinary meaning of the term "function," which includes "any of a group of related actions contributing to a larger action."   Webster's Ninth New Collegiate Dictionary, 498 (1986); *see also* Random House Thesaurus College Edition, 297 (1984) (a synonym of function is "act").   Here, the action, or act, is pulling the trigger, which leads to the automatic firing.

Courts have also interpreted "function" as the action of pulling the trigger.   *See Staples v. United States*, 511 U.S. 600, 600 (1994) ("The National Firearms Act criminalizes possession of an unregistered 'firearm,' 26 U.S.C. § 5861(d), including a 'machinegun,' § 5845(a)(6), which is defined as a weapon that automatically fires more than one shot with a single pull of the trigger, § 5845(b)."); *see also id*. at 602 n.1 ("As used here, the terms 'automatic' and 'fully automatic' refer to a weapon that fires repeatedly with a single pull of the trigger.   That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted.   Such weapons are 'machineguns' within the meaning of the Act.").

In *United States v. Fleischli*, 305 F.3d 643, 655-56 (7th Cir. 2002), the Seventh Circuit held that a "minigun" was a machinegun even though it was "activated by means of an electronic on-off switch rather than a more traditional mechanical trigger."   Despite Fleischli's arguments that the minigun was not a machinegun because it was not fired by pulling a traditional trigger, but rather was fired using an electronic switch, the court found to the contrary:   "Fleischli's

14

electronic switch served to initiate the firing sequence and the minigun continued to fire until the switch was turned off or the ammunition was exhausted.   The minigun was therefore a machine gun as defined in the National Firearms Act."   *Id.* (superseded by statute on other grounds); *see also United States v. Oakes*, 564 F.2d 384, 388 (10th Cir. 1977) (rejecting defendant's argument that because he had constructed a weapon with two triggers, it would not fire by a single function of the trigger, finding "it is undisputed that the shooter could, by fully pulling the trigger, and it only, at the point of maximum leverage, obtain automation with a single trigger function.   We are satisfied the gun was a machine gun within the statutory definition both in law and fact.")

Similarly here, the ERAD is a component that, when attached to a rifle, causes the rifle to function automatically.   The ERAD allows the firing sequence to be initiated by a single pull of the primary trigger, which is continually engaged as long as the shooter maintains rearward pressure on the trigger and the motor continues to push the shooter's finger forward.   (AR 0073; 79-80.)   Because the ERAD is a combination of parts designed and intended for use in converting a semiautomatic firearm into weapon which shoots automatically more than one shot by a single action—the pull of the trigger—it is a machinegun.   ATF's decision is not arbitrary or capricious, but is consistent with the facts based on a thorough examination and testing of the ERAD's functionality.

### B.  ATF's Classification is Consistent with Public Policy.

Because of their rapid rate of fire, machineguns have long been considered inherently dangerous and are therefore strictly regulated and generally unlawful to possess.   *See* 18 U.S.C. § 922(o); *United States v. Brock*, 724 F.3d 817, 824 (7th Cir. 2013) ("Congress has grouped together sawed-off shotguns, machineguns, and a variety of dangerous explosive devices for

15

stringent restrictions on possession and strict registration requirements for those that can be possessed lawfully."); *United States v. Brazeau*, 237 F.3d 842, 845 (7th Cir. 2001) ("The point is that most firearms do not have to be registered-only those that Congress found to be inherently dangerous."); *United States v. Kruszewski*, No. 91-0031P, 1991 WL 268684, at *1 (N.D. Ind. Dec. 10, 1991) ("The categories of firearms covered by U.S.C. Title 26 include only particularly dangerous weapons such as machineguns . . . . In *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008), the Supreme Court discussed a machinegun (M-16), and recognized a "limitation on the right to keep and carry arms" that includes "dangerous and unusual weapons." *See also United States v. Spires*, 755 F.Supp. 890, 892 (C.D. Cal. 1991) ("Congress believed these particular weapons, as opposed to firearms in general, are extremely dangerous and serve virtually no purpose other than furtherance of illegal activity.").

The device at issue in this case – the ERAD grip – enables a firearm to produce automatic fire with a single pull of the trigger, and therefore makes an otherwise semiautomatic firearm into one of the "dangerous and unusual weapons" recognized by the *Heller* court..   A rifle with the ERAD will continue to fire automatically once the trigger is pulled and remains depressed, with no further action by the shooter required.   The widely-available Bushmaster Model XMI150E2S fires at a rate of one shot per trigger pull and up to 120 rounds per minute.[4]   When

---

[4] Although there are no official documents establishing a maximum firing rate, it is thought that 120 rounds per minute would be a ceiling. Obviously, the rate of fire depends on how fast the shooter can pull and release the trigger. The Department of the Army has published 45 rounds per minute as the maximum effective rate of fire for AR-type weapons, meaning the number of shots that allow the shooter to effectively engage the intended target. *See* Department of the Army, Field Manual (FM) 3-22.9, Rifle Marksmanship M16-/M4-Series Weapons, Ch. 2-1 (Characteristics of M16-/M4-Series Weapons), Aug. 2008, available at http://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=1&cad=rja&uact=8&ved =0ahUKEwixkfTIrPzTAhUKwiYKHf9iA30QFggnMAA&url=http%3A%2F%2Fusacac.army.m

the ERAD device is attached to it, however, the same rifle is capable of firing at a rate of up to

500 rounds per minute.   (AR 0047.)   This unhindered automatic firing capability is the very

danger that the National Firearms Act was intended to protect against.   *See* 149 Cong. Rec.

H2944-02, H2950 (Apr. 9, 2003) ("these weapons … are inherently dangerous"); *United States*

*v. Newman*, 134 F.3d 373 (6th Cir. Jan. 21, 1998) (unpublished) ("Although the National

Firearms Act is ostensibly a revenue-generating statute enacted under Congress's taxation power,

it is clearly designed to regulate the manufacture, transfer, and possession of dangerous weapons.

Although the means by which Congress advanced its objectives are somewhat roundabout, close

analysis of the relevant provisions reveals an unmistakable intent to prohibit possession of any

machine gun the manufacture or importation of which was not explicitly authorized by the

Bureau of Alcohol, Tobacco, and Firearms.").   Nor is such easy transformation to an automatic

firearm consistent with the prohibition imposed by section 922(o) of the Gun Control Act.   *See*

*United States v. Haney*, 264 F.3d 1161, 1168 (10th Cir. 2001) ("banning possession of post 1986

machine guns is an essential part of the federal scheme to regulate interstate commerce in

dangerous weapons.").   Accordingly, ATF's assessment of the functionality of the ERAD grip,

including its ability to convert a firearm into an automatic weapon, support ATF's finding that

the ERAD is properly classified as a machinegun.

### C.  Freedom's "Reset Bar" Terminology Does Not Alter the Outcome

Freedom argues that FTISB's analysis is flawed because the ERAD's "reset bar" is not a

"trigger."   Freedom specifically claims that, "the trigger finger reset bar is not the trigger, nor

---

il%2Fsites%2Fdefault%2Ffiles%2Fmisc%2Fdoctrine%2FCDG%2Fcdg_resources%2Fmanuals
%2Ffm%2Ffm3_22x9.pdf&usg=AFQjCNEzIuwG-XuAHAhI5HSuun3SGVrZxg&sig2=5AF-
YguyuZCKe4rELoibbQ.

can it activate the firing sequence.   Only the shooter's conscious and deliberate pull of the reset

bar that subsequently engages the trigger that causes the weapon to fire and the ERAD cannot be

made to function other way."   (Docket No. 24 at 8.)   To this end, Freedom admits it has

created a device that incorporates the traditional firearm trigger as another intermediate

component in the firing mechanism.

Nevertheless, Freedom's position has been rejected by ATF before, and this rejection has

been upheld in court.   As discussed above, in *United States v. Fleischli,* 305 F.3d 643 (7th Cir.

2002), the Seventh Circuit rejected the appellant's argument that an electronic switch did not

meet the traditional definition of a trigger, holding as follows:

> This is a puerile argument, based on hyper-technical adherence to literalism.   We
> are not surprised to learn that Fleischli is not the first defendant to make such a
> brazen argument, although he appears to be the first to do so in this circuit.   We
> join our sister circuits in holding that a trigger is a mechanism used to initiate a
> firing sequence.   *United States v. Jokel*, 969 F.2d 132, 135 (5th Cir. 1992)
> (commonsense understanding of trigger is mechanism used to initiate firing
> sequence); *United States v. Evans*, 978 F.2d 1112, 1113–14 n. 2 (9th Cir.1992),
> *cert. denied*, 510 U.S. 821, 114 S.Ct. 78, 126 L.Ed.2d 46 (1993) (trigger is
> anything that releases the bolt to cause the weapon to fire).   Fleischli's definition
> "would lead to the absurd result of enabling persons to avoid the NFA simply by
> using weapons that employ a button or switch mechanism for firing."   *Evans*, 978
> F.2d at 1113–14 n. 2.   The dictionary definition of "trigger" includes both the
> traditional ("a small projecting tongue in a firearm that, when pressed by the
> finger, actuates the mechanism that discharges the weapon") and the more general
> ("anything, as an act or event, that serves as a stimulus and initiates or precipitates
> a reaction or series of reactions.").   *See* Webster's Unabridged Dictionary Of The
> English Language (2001).   Fleischli's electronic switch served to initiate the
> firing sequence and the minigun continued to fire until the switch was turned off
> or the ammunition was exhausted.   The minigun was therefore a machine gun as
> defined in the National Firearms Act.

*Id*. at 655–56.

Similarly, in *United States v. Carter*, 465 F.3d 658 (6th Cir. 2006), the Sixth Circuit

opined on the definition of a "trigger" under the National Firearms Act.   There, Carter appealed

18

a conviction for illegal possession of a machine gun and other parts designed or intended for use in converting a weapon into a machinegun.   *Id*. at 660.   Carter argued that the jury instruction on the definition of "trigger" was faulty because the indictment "did not mention a trigger mechanism among the parts he was alleged to have possessed" and thus the indictment failed to state a charge pursuant to the Federal Rule of Criminal Procedure 7(c)(1) because "the definition of 'machinegun' given at 26 U.S.C. § 5845 specifically includes a trigger."   *Id*. at 661. According to the testifying expert, the weapon was complete except for a trigger mechanism. Thus "[a]fter inserting a magazine with three rounds of ammunition, he said, he was able to make the gun fire all three rounds consecutively by pulling the bolt back and releasing it by hand."   *Id*. at 661-62.   The court held that, even in the absence of a traditional trigger, the weapon fell within the definition of a "machinegun."

> The reasoning adopted by other circuits, as well as simple logic, compels the conclusion that the district court's instruction was proper and not an abuse of discretion.   A trigger is generally "anything, as an act or event, that serves as a stimulus and initiates or precipitates a reaction."   Webster's Unabridged Dictionary 2021 (2nd ed.1997).   Within the realm of firearms, it is commonly understood as "a small projecting tongue in a firearm that, when pressed by the finger, actuates the mechanism that discharges the weapon."   *Id*.   However, the latter definition is obviously a context-specific articulation of the former. According to the testimony of the government's expert, the manipulation of his hands on the assembled weapon initiated a reaction, namely the firing of the gun and two automatic successive firings.   This manual manipulation constituted a trigger for purposes of the weapon's operation.   The district court's "trigger" instruction to the jury was not an abuse of discretion.

*Id.* at 665.

Finally, in *United States v. Camp*, 343 F.3d 743 (5th Cir. 2003), the defendant modified a semiautomatic rifle by adding an electrically operated trigger mechanism, which operated as follows:

> When an added switch behind the original trigger was pulled, it supplied electrical power to a motor connected to the bottom of a fishing reel that had been placed inside the weapon's trigger guard; the motor caused the reel to rotate; and that rotation caused the original trigger to function in rapid succession. The weapon would fire until either the shooter released the switch or the loaded ammunition was expended.

*Id.* at 744.

An ATF expert testified that a true trigger activating devices, although giving the impression of functioning as a machinegun, are not classified as machineguns because the shooter still has to separately pull the trigger each time he/she fires the gun by manually operating a lever, crank, or the like.   To this end, the court stated:

> We reject Camp's contention that the switch on . . . his firearm was a legal "trigger activator".   As discussed, those activators described by the ATF Agent require a user to separately pull the activator each time the weapon is fired. Camp's weapon, however, required only one action – pulling the switch he installed – to fire multiple shots.

*Camp*, 343 F.3d at 745.

Similarly here, even though Freedom refers to its ERAD as a "trigger reset assistance device," a firearm fitted with the ERAD does not require separate, mechanical pulls of the trigger (*i.e.*, pull and release) to discharge more than a single round.   The trigger is moving at such a rapid rate that the shooter's finger does not pull the trigger each time to fire each shot, but instead pulls the trigger once and then remains stationary, resisting forward pressure, as the motor causes the weapon to function automatically, and continue to fire rounds.   It is undisputed that when the shooter's finger remains connected to the "reset bar," and an electric motor is activated, the "reset bar" functions as a trigger in and of itself, and controls the pace of the firing sequence.   The only action required by the shooter is that of continued rearward pressure.   To this end, the ERAD is capable of firing at a rate of 500 rounds per minute and does not require

20

any additional act by the shooter after the motor is turned on and the shooter pulls the "reset bar" (or what FTISB describes as the "primary trigger") once without releasing pressure.   (AR 0047.)

Accordingly, in spite of its branding and terminology, the ERAD meets the definition of a machinegun.

### D.  The ERAD Is Not The Same As "Bump Fire" or "Slide Fire" Stock.

Freedom also argues that its ERAD is similar to "bump fire" or "slide fire" stock, which has been found not to be machinegun technology.   (Pl.'s Br. at 24 (citing AR at 231 and Pl.'s Exhibits A, B, and C, Docket Nos. 24-1, 24-2, 24-3).)   "Bump firing" is the process of using the recoil of a semi-automatic firearm to fire in rapid succession, simulating the effect of an automatic firearm when performed with a high level of skill and precision by the shooter.   Bump firing requires the shooter to manually and simultaneously pull and push the firearm in order for it to continue firing.   (*See* Pl.'s Ex. A, Docket No. 24-1 at 3-4; Pl.'s Ex. B, Docket No. 24-3 at 4-5.)   The shooter must use both hands to pull the trigger rearward - and the other to push the firearm forward to counteract the recoil - to fire in rapid succession.   While the shooter receives an assist from the natural backfire of the weapon to accelerate subsequent discharge, the rapid fire sequence in bump firing is contingent on shooter input, rather than mechanical input, and thus cannot shoot "automatically."   (Pl.'s Ex. A, Docket No. 24-1 at 3-4; Pl.'s Ex. B, Docket No. 24-3 at 4-5.)

Conversely, the ERAD does not require any such skill or input from the shooter.   A rifle equipped with the ERAD will utilize a battery-powered motor to continue to fire automatically once the trigger is pulled and remains depressed, with no other action by the shooter required. Indeed, in its classification letter, FTISB noted that the AR-type trigger functions as a

"secondary trigger" in that "it merely becomes a part of the firing sequence."   (AR at 0071.)

Freedom argues that the ERAD allows the shooter to make a "conscious decision to apply or not

apply rearward pressure to fire the weapon by initiating a trigger function," (AR at 47

(demonstration video)).   This argument is technically correct to the extent the shooter may make

a purposeful choice to cease applying rearward pressure to the reset bar/primary trigger.   In fact,

this is true of any machinegun—a shooter makes a conscious decision to pull and release the

trigger.   What is misleading, however, is any assertion that the shooter may make a conscious

choice to pull and release the trigger for *each individual, subsequent shot*.   In accepting this

argument, the shooter would presumably be able to control the precise number of shots he

intends to fire.   For example, he could intend to fire a precise number of rounds of ammunition,

such as 263 rounds, and actually expel that exact number of rounds.   With the ERAD engaged,

however, the number of rounds fired is the result of automatic functioning so long as the shooter

is applying pressure on the "reset bar," and therefore the number of rounds expelled cannot

accurately be characterized as conscious or deliberate.   (AR 0047; 0073.)

     In contrast, bump firing requires the shooter to manually pull and push the firearm in

order for it to continue firing.   Generally, the shooter must use both hands—one to push forward

and the other to pull rearward—to fire in rapid succession.   While the shooter receives an assist

from the natural recoil of the weapon to accelerate subsequent discharge, the rapid fire sequence

in bump firing is contingent on shooter input in pushing the weapon forward, rather than

mechanical input, and is thus not an automatic function of the weapon.

     Freedom also argues that FTISB's decision regarding the ERAD is inconsistent with its

decision regarding the Akins Accelerator, which was an accessory attached to firearm that

accelerated rate of fire.  *Akins v. United States*, 312 F. App'x 197 (11th Cir. 2009).   On the contrary, ATF's decision is entirely consistent with its decision regarding the Akins Accelerator and ATF Ruling 2006-2.[5]

To operate the Akins Accelerator, the shooter pulled the trigger one time, initiating an automatic firing sequence, which in turn caused the rifle to recoil within the stock, permitting the trigger to lose contact with the finger and manually reset (move forward).  *Akins*, 312 F. App'x at 199.   Springs then forced the rifle forward in the stock, forcing the trigger against the finger, which caused the weapon to discharge the ammunition until the shooter released the constant pull or the ammunition is exhausted.   Put another way, the recoil and the spring-powered device caused the firearm to cycle back and forth, impacting the trigger finger, which remained rearward in a constant pull, without further input by the shooter, thereby creating an automatic firing effect.  *Id.*   The advertised rate of fire for a weapon with the Akins Accelerator was 650 rounds per minute.   *Id.*

The Eleventh Circuit found that ATF properly classified the Akins Accelerator as a machinegun because:

> [a] machinegun is a weapon that fires "automatically more than one shot, without manual reloading, by a single function of the trigger."   26 U.S.C. § 5845(b). The interpretation by the Bureau that the phrase "single function of the trigger" means a "single pull of the trigger" is consonant with the statute and its legislative history.   After a single application of the trigger by a gunman, the Accelerator uses its internal spring and the force of recoil to fire continuously the rifle cradled inside until the gunman releases the trigger or the ammunition is exhausted. Based on the operation of the Accelerator, the Bureau had authority to "reconsider and rectify" what it considered to be a classification error.   That decision was not

---

[5] Initially ATF classified the Akins Accelerator as a non-machinegun, but after a subsequent test fire, it was determined the Akins Accelerator converts a semiautomatic rifle into a weapon capable of firing automatically by a single function of the trigger and was therefore in fact a machinegun.   Thus, ATF overruled its earlier classification.

arbitrary and capricious.

*Id*. at 200.

      Pursuant to ATF Ruling 2006-2, any device that is truly analogous to the Akins Accelerator - *i.e.*, a device that allows a weapon to fire automatically when the shooter pulls the trigger - is properly classified as a machinegun.   (AR at 630-32.)   Specifically, the Rule provides that a firearm with the following functionality constitutes a machinegun:

> A shooter pulls the trigger which causes the firearm to discharge.   As the firearm moves rearward in the composite stock, the shooter's trigger finger contacts the stock.   The trigger mechanically resets, and the device, which has a coiled spring located forward of the firearm receiver, is compressed.   Energy from this spring subsequently drives the firearm forward into its normal firing position and, in turn, causes the trigger to contact the shooter's trigger finger.   Provided the shooter maintains finger pressure against the stock, the weapon will fire repeatedly until the ammunition is exhausted or the finger is removed.   The assembled device is advertised to fire approximately 650 rounds per minute. Live-fire testing of this device demonstrated that a single pull of the trigger initiates an automatic firing cycle which continues until the finger is released or the ammunition supply is exhausted.

(AR at 631.)

      Like the Akins Accelerator, the ERAD requires a single pull of the trigger to activate the firing sequence, which continues until the shooter's finger is released, or the firearm depletes its ammunition supply.   (AR at 354-68, 395-97.)   Because the ERAD is a part designed and intended for use in converting a semiautomatic firearm into weapon which shoots automatically more than one shot by a single action—the pull of the trigger—it is a machinegun.   Thus, ATF's decision is not arbitrary or capricious, but is consistent with the facts based on a thorough examination and testing of the ERAD's functionality.

      With regard to Plaintiff's Exhibit B (Docket No. 24-3), the 3MR reset trigger device submitted to ATF was an internal mechanism, which operated to push the shooter's finger

forward.   It does not run on a motor, and although the mechanism assists in manually resetting the trigger, the shooter is still required to release the trigger to fully reset the trigger.   Thus, during inspection, ATF determined that the weapon could not be fired automatically.   The item was tested by seven individuals at ATF prior to the classification, and no individual was able to generate automatic fire.   Because the reset trigger required a release of the trigger and subsequent pull before another round was expelled, the 3MR was not classified as a machinegun.

Based on the foregoing, FTISB has not rendered inconsistent decisions, but has inspected and analyzed each prototype or device presented to it by Freedom for classification, and has issued its decisions based on the unique characteristics of each.   Accordingly, ATF's classification of the ERAD device as a machinegun is not arbitrary, capricious, an abuse of discretion, or otherwise inconsistent with the applicable law.

## CONCLUSION

Based on the foregoing, the Court must enter judgment in favor of the Bureau of Alcohol, Tobacco, Firearms, and Explosives as to all of Plaintiff's claims against it.

Respectfully submitted,

JOSH J. MINKLER
United States Attorney

By:     *s/ Shelese Woods*
Shelese Woods
Assistant United States Attorney

## CERTIFICATE OF SERVICE

This is to certify that I have served a copy of the foregoing upon the Plaintiff herein by electronically filing a copy thereof through the Court's CM/ECF system, which will transmit a copy electronically to the following on the 27th day of July, 2017:

Brent R. Weil
KIGHTLINGER & GRAY, LLP
bweil@k-glaw.com

Timothy R. Rudd
Scott Braum
SCOTT L. BRAUM & ASSOCIATES, LTD.
trr@braumlaw.com

_s/ Shelese Woods_
Shelese Woods
Assistant United States Attorney
10 West Market Street
Suite 2100
Indianapolis, Indiana 46204

26