UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| FREEDOM ORDNANCE MFG., INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:16-cv-243-RLY-MPB |
| | ) |
| THOMAS E. BRANDON, Director, | ) |
| Bureau of Alcohol Tobacco Firearms | ) |
| and Explosives, | ) |
| | ) |
| Defendant. | ) |

**REPLY BRIEF IN SUPPORT OF CROSS MOTION FOR SUMMARY JUDGMENT
AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

Freedom Ordnance Manufacturing, Inc. ("Freedom") has not provided a legal or factual

basis establishing that the Bureau of Alcohol, Tobacco, Firearms and Explosives' ("ATF")

decision is arbitrary and capricious.    Freedom admits that this case may be decided as a matter

of law on the administrative record,[1]  but simply disagrees with ATF's conclusion that

---

[1] Freedom states that it has submitted the extra-record declarations of Michael Winge (Pl.'s Ex. D, Docket No. 24-4) and Richard Vasquez (Pl.'s Ex. E, Docket No. 24-5) to "inform the Court's analysis as to the persuasiveness of ATF's informal classification system."   (Pl.'s Resp. Br., Docket No. 32 at 14.)   As discussed in ATF's opening brief, the task of the reviewing court is to apply the appropriate Administrative Procedure Act ("APA") standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court.." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971) ("That review is to be based on the full administrative record that was before the Secretary at the time he made his decision."), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977); *Highway J Citizens Grp. v. Mineta*, 349 F.3d 938, 952 (7th Cir. 2003) ("the reviewing court considers only the administrative record already in existence, not some new record made initially [in that court].").   The post-record Winge and Vasquez reports were not before the agency when it made its decision.   Freedom appears to concede this point, stating that the record is sufficient to decide the issues before the Court.   (Pl.'s Resp. Br., Docket No. 32 at 14-15.)

1

Freedom's Electronic Reset Assist Device ("ERAD") be classified as a machinegun.    Based on

the foregoing, ATF is entitled to summary judgment.

## ARGUMENT

### A.  The Proper Standard of Review of ATF's Classification.

Freedom argues that ATF's decision is entitled only to limited deference - not *Chevron*

(referring to *Chevron v. Natural Resources Defense Council*, 467 U.S. 837 (1984)) deference -

because the decision is an "informal" classification letter.    In its opening brief, ATF set out the

well-established standard of review applicable in cases brought under the APA, 5 U.S.C. §

706(2)(A), which is whether the agency's decision is arbitrary and capricious.    As the Supreme

Court has held, the agency's decision is entitled to a presumption of regularity, and the Court

may not substitute its judgment for that of the agency.    *Marsh v. Or. Nat. Res. Council*, 490

U.S. 360, 378 (1989).    As it pertains to this case, it is important to note that traditional

deference to the agency is at its highest where a court is reviewing an agency action that required

a high level of technical expertise.    *Id.* at 377.

With regard to an agency's "scientific and technical determination," the Seventh Circuit has

also instructed that, "a reviewing court must generally be at its most deferential."    *Indiana v.*

*E.P.A.*, 796 F.3d 803, 811 (7th Cir. 2015) (quoting *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87,

103 (1983)) (internal citation omitted).    This is especially so "when a regulation concerns a

complex and highly technical regulatory program in which the identification and classification of

relevant criteria necessarily require significant expertise and entail the exercise of judgment

grounded in policy concerns."    *Perez v. Mortgage Bankers Ass'n*, 135 S. Ct. 1199 (2015).    ).

In this regard, other federal courts have applied *Chevron* deference to ATF classifications and

other agency determinations that require substantial technical analysis.    *See, e.g., Firearms Imp./Exp. Roundtable Trade Grp. v. Jones*, 854 F. Supp. 2d 1, 15 (D.D.C. 2012) *aff'd sub nom, Firearms Imp./Exp. Roundtable Trade Grp. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 498 F. App'x 50 (D.C. Cir. 2013) (applying the *Chevron* standard to ATF's denial of its application to import firearm barrels pursuant to the GCA); *see also Modern Muzzleloading, Inc. v. Magaw*, 18 F. Supp. 2d 29, 35-36 (D.D.C. 1998) (applying the Chevron standard to ATF's classification of a rifle under the GCA).

The classification of the ERAD as a machinegun reflects ATF's technical expertise and discretion and is therefore entitled to deference.

Freedom relies almost exclusively on a district court opinion from the District of Columbia, *Innovator Enterprises, Inc. v. Jones*, 28 F. Supp. 3d 14, 21 (D.D.C. 2014), where the court held that ATF's classification letter classifying a developer's device as a firearm silencer within the meaning of 18 U.S.C. § 921(a)(24) was entitled to *Skidmore*, rather than *Chevron*, deference. The *Innovator* decision was a departure from other federal decisions, which have applied *Chevron* deference to the fruits of an agency's informal adjudication.    The court in *Innovator* held that *Skidmore* deference was warranted because the Agency's classification letter, which was "just over a page long, and contain[ed] only a few short paragraphs of reasoning," constituted a "short, informal document that contains little more than uncited, conclusory assertions of law, and no relevant agency regulations."    *Id*. at 23-24 (referring to *Skidmore v. Swift & Co.*, 323 U.S. 134, 65 S.Ct. 161 (1944), holding that an administrative agency's interpretative rules deserve deference according to their persuasiveness).

Here, ATF's October 27, 2016, classification letter stands in stark contrast to the one-page

letter issued to *Innovator*, and provides a substantive and in-depth analysis of the ERAD's functionality, including diagrams and drawings, applying the relevant statutory provisions to the ERAD, explaining in great length the steps Firearms Technology Industry Services Branch ("FTISB") took to assess whether the ERAD constitutes a machinegun, and detailing the reasons why it classified the ERAD as a machinegun within the meaning of 26 U.S.C. § 5845(b).

Finally, unlike in *Innovator*—where the district court held that the Agency had not given careful consideration to the question because of the brevity of the Agency's classification letter and because "the [A]gency has no formal guidance or written procedure for classifying silencers"—here the Agency has a long history of addressing industry requests for firearm classifications that implicate the definition of a "machinegun" under 26 U.S.C. § 5845(b).   As the federal entity charged with interpreting and enforcing the nation's firearms laws and regulations governing the firearms industry, ATF takes seriously its classifications of weapons as machineguns and has consistently promulgated rules regarding the application of its classification standards.   *See* ATF Rule 81-4 (classification of AR14 auto sear as machinegun), Administrative Record ("AR") at 635; ATF Rule 2004-5 (classification of Aircraft Machine Gun known as Minigun), AR at 633-34; ATF Rule 2006-2 (definition of machinegun as applied to devices designed to increase rate of fire of a semiautomatic firearm), AR at 630-32.   Thus ATF has given careful consideration to the application of the Gun Control Act's definition of a "machinegun," and its application to industry devices implicating the statutory framework for a long period of time.[2]

---

[2] Freedom also cites *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 294 F. Supp. 2d 896 (E.D. Ky. 2003), for support.   However, the *One TRW* court did not conclusively hold that *Chevron* was inapplicable to the agency's decision.   Rather, the court stated that "[t]he authority

**B.  ATF's Classification Is Not Arbitrary or Capricious and is Supported by the Record**

In its Response Brief, Freedom argues that "the determinative issue of whether the ERAD constitutes a machinegun is whether it enables a firearm to fire more than one round with a single function of the trigger."   (Pl.'s Resp. Br. at 4.)   This, however, is not supported by the plain language of the statute, which says that the determinative issue is not simply whether a weapon fires "more than one shot…by a single function of the trigger," but that it does so *automatically*.   26 U.S.C. § 5845(b).[3]   Thus, the "single function of the trigger" constitutes only half of the analysis.

By focusing only on a portion of the statutory language, Freedom also argues that ATF has changed its position and interpretation of "single function of the trigger," and that the ERAD is similar to "bump-fire" devices that ATF has not classified as machineguns.   In actuality, ATF classifies weapons as machineguns only when a single function of the trigger results in the firing of more than one shot through automatic functioning.   For example, in ATF Ruling 2004-5, ATF explained that a hand cranked Gatlin gun is not a "machinegun "because it is not a weapon

---

is inconsistent on the question of whether ATF firearm classifications enjoy full *Chevron* deference" and "the courts . . . consistently recognize that when such decisions are shown to be the product of substantial agency expertise, experience and thought, they are entitled to at least the highest level of *Skidmore* respect."   *Id*. at 900.   Therefore, the court concluded that "ATF firearm classifications are usually reviewed under an 'arbitrary and capricious' or similar standard."   *Id.*

[3] 26 U.S.C. § 5845(b), defines a machinegun as

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

that fires automatically."   (AR at 633.)

Contrary to Freedom's assertion, ATF "has consistently taken the position that manually operated 'two-stage' triggers result in a firearm which fires one shot for each function of the trigger.   Thus, the phrase 'single function of the trigger' [means] a single <u>movement</u> of the trigger, whether that movement is the pull of the trigger or the release of the trigger."   (AR at 636-37, ATF Memo on "Definition of 'Single Function of Trigger' under 26 U.S.C. § 5845(b)," Sept. 28 1989 (emphasis in original).)

Moreover, ATF's classifications of two-stage triggers have no meaningful application in this case because the ERAD is not a two-stage trigger allowing one shot to be fired when the trigger is pulled and another when the trigger is released.   Rather, to create "movement," the ERAD uses an electric motor.   Thus, while there is no doubt that the trigger moves, the electric motor moves the trigger, not the shooter.   The shooter takes absolutely no action to release the trigger. Indeed, the shooter does just the opposite by continuing to apply rearward pressure.   Further, the shooter makes no decision to pull again, but merely maintains a constant pull as the motor automatically causes movement of the trigger and the weapon continually fires.

ATF's classification of the operation of the ERAD device as a single function of the trigger is also consistent with a previous classification of the "AR 16" device.   (AR at 369-73.)   In this device, continued pressure applied to the trigger allowed the rifle to be fired until the release of the trigger.   (*Id*.)   The manufacturer of the "AR 16" argued that a device (cam) installed in the firearm removed the impediment to the trigger and allowed the operator to once again pull the trigger.   (*Id*.)   However, ATF found that pressure was applied to the trigger and the rifle fired, and unless the pressure from the trigger finger was removed, the rifle continued to fire.   (*Id*.)

6

Therefore, a single pull of the trigger by the user of the firearm resulted in the firing of more than one shot.   (*Id*.)   The classification concluded that "the fact that operation of the firearm causes movement of the trigger is not relevant to this determination."   (*Id*.)   Similarly, the fact that the ERAD device moves the trigger forward by a motor is irrelevant to determine whether the device causes a firearm to fire automatically by a single function of the trigger.

Freedom also claims that ATF erroneously referred to the rapid, maximum firing rate made possible by using the ERAD.   (Pl.'s Resp. Br. at 5.)   ATF is not arguing that rate of discharge is the dispositive factor in its classification.   But the fact that a firearm shoots hundreds of rounds per minute is a relevant.   The rate of fire is a significant factor taken into consideration in determining whether a weapon functions, or is converted to function, automatically by a single function of the trigger.   The term "automatic" is defined to include "any firearm in which a single pull and continuous pressure upon the trigger (or other firing device) will produce rapid discharge of successive shots so long as ammunition remains in the magazine or feed device in other words, a machinegun."   (AR at 634 (ATF Rule 2004-5 citing to the dictionary definition of "automatic").)   Automatic functioning is the functioning of the firearm such that it is "acting or operating in a manner essentially independent of external influence or control."   *Id*.   The rate of fire is therefore evidence of the necessity of automatic functioning.   Indeed, the Administrative Record contains other examples of reference to the high rates of fire of machineguns. *See, e.g.,* AR at 599-607.   These firearms have high rates of fire because the independent mechanical operation of the firearm allows a large number of rounds to be expelled in a short amount of time.   While not solely determinative, high rate of fire is a relevant factor in determining whether a firearm may be operating automatically, for that is the entire point of

automatic fire, to shoot faster than a human being may possibly accomplish unaided.

In summary, because the ERAD is a combination of parts designed and intended for use in converting a semiautomatic firearm into weapon which shoots automatically more than one shot by a single function of the trigger—the pull of the trigger—it is a machinegun.   ATF's decision is not arbitrary or capricious, but is consistent with the facts based on a thorough examination and testing of the ERAD's functionality.

### C.  Freedom's Comparison Classifications Are Not Applicable

Freedom also argues that its ERAD should be classified the same as a bump fire devices because they use "gas/recoil energy to facilitate the trigger reset while the ERAD uses electrical energy to facilitate the trigger reset," which Freedom asserts is "a distinction without a difference."   (Pl.'s Resp. Br. at 6.)   For the reasons discussed in ATF's opening brief, there is in fact a significant difference between the devices, particularly because of the manual, skill-based methods required to operate a bump fire device.   In contrast, the ERAD operates mechanically, requiring only that the shooter maintain rearward pressure on the primary trigger to produce automatic fire.

Freedom argues that that the only difference between the ERAD and a non-machinegun bump fire device "is that continuous pressure is applied to the forend of the gun with the non-trigger hand and the power employed to assist in trigger reset is recoil.   Legally that is no difference at all."   (Pl.'s Resp. Br. at 6.)   In arguing that the "continuous pressure" is the same in the ERAD and in bump fire devices, Freedom conflates the continuous pressure on the forend of a firearm necessary for bump fire devices to operate (the necessity of which means there is no automatic functioning), with the continuous pressure on the trigger of the ERAD that constitutes

8

a single "function" of the trigger.   This difference is key because the constant pressure of the non-trigger hand is manual, not automatic.   Far from "novel," ATF has provided this analysis to the industry in the past, and it is included in the Administrative Record.   (AR at 350.)

Freedom also argues that the Tac-Con 3MR trigger is indistinguishable from the ERAD. Freedom's argument, however, is based upon a misunderstanding of the 3MR's operation. Although the 3MR is a trigger mechanism that pushes a shooter's finger forward in a way that is similar to the ERAD, there is a vital difference.   The 3MR pushes the finger very close to the point at which the trigger resets, but actually requires that a shooter *release* the original pull before the trigger resets and another shot may be fired.   (AR at 259-331.)[4]   Therefore, any comparison between the ERAD and the 3MR is inapposite because the 3MR requires exactly what the ERAD does not—a release to end the first "pull" and a separate "pull" or function for the firing of each subsequent round.

Freedom also attempts to distinguish the ERAD from the Akins Accelerator, which ATF classified as a machinegun, arguing that "the Akins Accelerator further used nonhuman energy (springs) to force the trigger against the user's finger causing the weapon to discharge at a rate of 650 rounds per minute."   (Pl.'s Resp. Br. at 13.)   The ERAD, however, operates on the same principle—a single rearward pull without a release, and non-human input for automatic functioning.   (AR at 377-87 (patent documents Akins Accelerator, specifically paras. 70 and 78,

---

[4] Freedom claims that there is no evidence in the Administrative Record for this proposition. However, the 3MR patent documents in the Administrative Record explicitly explain how the device operates.   (AR at 259-331.)   Specifically, the documents explain that when the trigger is pulled and held, the hammer is retained by the device, such that it cannot move forward and fire another round.   (AR at 277-78.)   Then, when the trigger is "released," the hammer "is thus retained in the cocked position…preparatory to firing by another trigger pull."   (AR at 278-79.)

9

describing the Akins Accelerator functionality).)    Whether automatic fire is generated by spring recoil or motor is irrelevant because the result is the same:    a single pull of the trigger by the shooter causes the firearm to shoot automatically and continuously.

In sum, ATF's classification of the ERAD is consistent with its other determinations.

## CONCLUSION

Based on the foregoing, the Court must enter judgment in favor of the Bureau of Alcohol, Tobacco, Firearms, and Explosives as to all of Plaintiff's claims against it.

Respectfully submitted,


JOSH J. MINKLER
United States Attorney

By:    *s/ Shelese Woods*
Shelese Woods
Assistant United States Attorney

10

## CERTIFICATE OF SERVICE

This is to certify that I have served a copy of the foregoing upon the Plaintiff herein by electronically filing a copy thereof through the Court's CM/ECF system, which will transmit a copy electronically to the following on the 13th day of September, 2017:

Brent R. Weil
KIGHTLINGER & GRAY, LLP
bweil@k-glaw.com

Timothy R. Rudd
Scott Braum
SCOTT L. BRAUM & ASSOCIATES, LTD.
trr@braumlaw.com

s/ Shelese Woods
Shelese Woods
Assistant United States Attorney
10 West Market Street
Suite 2100
Indianapolis, Indiana 46204

11