UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | | |
|---|---|---|
| FREEDOM ORDNANCE MFG., INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 3:16-cv-00243-RLY-MPB |
| | ) | |
| THOMAS E. BRANDON, Director, Bureau of | ) | |
| Alcohol Tobacco Firearms and Explosives, | ) | |
| | ) | |
| Defendant. | ) | |

**ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

Freedom Ordnance Manufacturing, Inc. ("Freedom") designed an electronic firearm accessory—the Electronic Reset Assist Device, or ERAD—that enhances the operation of a semi-automatic firearm by allowing the user to fire more rapidly. After receiving an ERAD prototype and supporting materials from Freedom, the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") classified the ERAD as a "machinegun" under the National Firearms Act. ATF's classification prevents Freedom from manufacturing and selling the ERAD.

None too pleased with ATF's classification, Freedom instituted the present action against ATF and its Director, Thomas E. Brandon (collectively "ATF"), alleging violations of the Administrative Procedure Act ("APA") and seeking a declaration that its device is not a machinegun. Before the court are cross-motions for summary judgment. Finding no error with ATF's classification, the court **DENIES** Freedom's Motion for Summary Judgment and **GRANTS** ATF's Cross-Motion for Summary Judgment.

1

I.  **Background**

   A.  **Statutory Framework**

The Gun Control Act of 1968 ("GCA"), 18 U.S.C. § 921 *et seq.*, regulates the licensing and distribution of firearms. *See Printz v. United States*, 521 U.S. 898, 902 (1997). The GCA makes it unlawful for any person to transfer or possess a machinegun manufactured after May 19, 1986. 18 U.S.C. § 922(o); *see also Akins v. United States*, 312 F. App'x 197, 198 (11th Cir. 2009). The GCA incorporates the definition of "machinegun" from a separate federal statute: the National Firearms Act ("NFA"), 26 U.S.C. § 5801 *et seq. See* 18 U.S.C. § 921(a)(23). The NFA defines a machinegun as:

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or *combination of parts designed and intended, for use in converting a weapon into a machinegun*, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b) (emphasis added). Automatically means that the weapon "fires repeatedly with a single pull of the trigger." *Staples v. United States*, 511 U.S. 600, 602 n. 1 (1994). "That is, once its trigger is depressed, the weapon will automatically continue to fire until its trigger is released or the ammunition is exhausted." *Id.* ATF, the agency charged with investigating, administering, and enforcing both the GCA and the NFA, *see* 28 C.F.R. § 0.130(a)(1) – (2), has further explained that a device "that is designed to attach to a firearm and, when activated by a single pull of the trigger, initiates an automatic firing cycle that continues until either the finger is released or the

2

ammunition supply is exhausted, is a machinegun" under the NFA and GCA. (*See* Administrative Record ("A.R.") at 631 – 632, ATF Rule 2006-2 at 2-3).

### B. Freedom's Classification Requests

Before March of 2016, Freedom submitted its first trigger reset device to ATF for classification.[1] (*See* A.R. at 2 – 4). ATF classified this "trigger reset device" as a machinegun. (*Id.*).

As a result, Freedom redesigned the trigger reset device and developed the ERAD. (*Id.* at 1). In April of 2016, Freedom submitted the ERAD to ATF seeking confirmation that the ERAD was not a machinegun. (*Id.*). In September of 2016, Freedom submitted a supplemental letter ("Supplemental Letter") which expanded on Freedom's position. (*Id.* at 18 – 24). In the Supplemental Letter, Freedom explained that the ERAD is composed of a transfer bar (or the trigger finger reset bar), an electric motor, and an electric switch. (*Id.* at 20 – 21). As the user engages the electric switch and the trigger finger reset bar, the motor activates, separating the trigger of the firearm from the trigger finger reset bar. (*See id.* at 21). As further opined by Freedom in its Supplemental letter, the ERAD is not a machinegun because the trigger finger reset bar cannot apply rearward tension, and as a result, the ERAD can only fire one shot per single pull of the trigger. (*Id.*).

### C. ATF's Classification Decision

---

[1] The ATF encourages manufacturers to seek an ATF classification of product prior to manufacture in order to avoid unnecessary expense. *Sig Sauer, Inc. v. Jones*, 133 F.Supp.3d 364, 367 n. 2 (D. N.H. 2015) (citing Bureau of Alcohol, Tobacco, Firearms and Explosives, National Firearms Act Handbook ("ATF Handbook") 7.2.4 (2009), *available at* https://www.atf.gov/firearms/national-firearms-act-handbook), *aff'd sub nom. Sig Sauer, Inc. v. Brandon*, 826 F.3d 598, 606 (1st Cir. 2016).

On October 27, 2016, ATF sent Freedom a thirteen-page letter in which ATF ultimately concluded that the ERAD was a machinegun under the NFA. (*Id.* at 70 – 82). ATF classified the trigger finger reset bar as the "primary trigger" and the existing firearm trigger as the "secondary trigger," and explained that the firearm's existing trigger "merely becomes a part of the firing sequence, but does not initiate firing when the E-RAD is installed." (*Id.* at 71) (emphasis omitted). ATF explained that when the grip button (or "electric switch" according to Freedom) is depressed and constant pressure is applied to the primary trigger, the hammer is released and a shot is fired. (*Id.* at 72). Immediately after, the disconnector catches the hammer preventing hammer follow.[2] (*Id.* at 77). In a firearm without the ERAD installed, the hammer will reset only when the user actually releases pressure on the trigger. (*Id.*). However, in firearms with the ERAD installed, the hammer is reset by the electric motor, obviating the need for the user to release the trigger. (*Id.* at 78). As a result, the user never has to release the primary trigger and can fire subsequent shots by applying a constant pull. (*Id.*). ATF reasoned that "[a] single pull of the trigger by the shooter therefore starts a firing sequence in which *semiautomatic* operation is made *automatic* by an electric motor." (*Id.* at 79) (emphasis in original). Therefore, ATF classified the ERAD as a combination of parts designed and intended solely and exclusively for use in converting a weapon into a machinegun, and thus, a "machinegun" under the NFA. (*Id.* at 81).

---

[2] "Hammer follow" refers to the process where the hammer moves forward again causing a second shot to be fired without an additional pull of the trigger. (*Id.* at 77).

On December 13, 2016, Freedom filed the present Complaint against ATF challenging its classification of the ERAD as a machinegun. (Filing No. 1). On June 2, 2017, Freedom moved for summary judgment, and on July 27, 2017, ATF filed a Cross-Motion for summary judgment. (Filing Nos. 23 and 27).[3] Having been fully briefed, the matter is now ripe for a decision.

## II.  Standard of Review

Freedom's challenge to ATF's determination requires the court to apply two distinct but potentially overlapping standards of review under the APA. *See Fox v. Clinton*, 684 F.3d 67, 74 – 76 (D.C. Cir. 2012). First, the court must determine how much deference ATF's interpretation of the NFA warrants. Second, the court must determine whether ATF's decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A); *see also Fox*, 684 F.3d at 74 – 77 (discussing and then applying two standards of review: one with respect to the agency's interpretation of the statute, and one with respect to the agency's ultimate denial of appellant's request); *see also Innovator Enterprises, Inc. v. Jones*, 28 F.Supp.3d 14, 21 – 24 (D. D.C. 2014) (determining whether classification letter was entitled to *Chevron* deference and then determining whether ultimate action was arbitrary and capricious).

---

[3] Freedom also filed a Motion for Oral Argument in the present matter. The administrative record, however, is thorough, and the issues in this case have been sufficiently briefed. Since oral argument will not assist the court, Freedom's motion is denied. *See Hill v. Porter Memorial Hosp.*, 90 F.3d 220, 224 (7th Cir. 1996) (citing Fed. R. Civ. P. 78); *see also* S.D. IND. L.R. 7-5(d).

### A. Agency's Interpretation of a Statute

Courts ordinarily defer to an agency's interpretation of a statute that it is entrusted to administer. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984). When applying *Chevron* deference, a court will generally uphold an agency's interpretation of a statute if the statute at issue is ambiguous and the agency's interpretation is reasonable. *Christensen v. Harris Cty.*, 529 U.S. 576, 586 – 87 (2000).

An agency interpretation qualifies for *Chevron* deference (a determination sometimes referred to as the Chevron "step-zero" determination) when "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226 – 27 (2001); *see also Brumfield v. City of Chicago*, 735 F.3d 619, 625 – 26 (7th Cir. 2013). This requires the court to consider "the interstitial nature of the legal question, the related expertise of the [a]gency, the importance of the question to administration of the statute, the complexity of that administration, and the careful consideration the [a]gency has given the question over a long period of time . . . ." *Barnhart v. Walton*, 535 U.S. 212, 222 (2002).

However, not all agency interpretations are entitled to *Chevron* deference. Some are only entitled to *Skidmore* deference, which refers to a lesser amount of deference that is determined by the persuasiveness of the agency's reasoning in relation to the nature of the issue. *See Krzalic v. Republic Title Co.*, 314 F.3d 875, 878 (7th Cir. 2002) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)). Under *Skidmore*, the court defers to

the agency's interpretation but only to the extent that the interpretation has the "'power to persuade.'" *Christensen*, 529 U.S. at 587 (quoting *Skidmore*, 323 U.S. at 140); *see also White v. Scibana*, 390 F.3d 997, 1000 (7th Cir. 2004) ("[S]ome [agency interpretations] are treated as persuasive only, based upon the form, content, circumstances, and reflected expertise of the interpretation.") (citation omitted).

      **B.**      **Agency's Decision under the APA**

When reviewing a decision of an administrative agency, the typical Rule 56 summary judgment standard does not apply. Instead, the district court assumes the role of a reviewing court. *Cronin v. United States Dep't of Agric.*, 919 F.2d 439, 443 (7th Cir. 1990). The district court is typically confined to review the administrative record already in existence, and "[t]he task of the reviewing court is to apply the appropriate APA standard of review, 5 U.S.C. § 706, to the agency decision based on the record the agency presents to the reviewing court." *Florida Power & Light Co. v. Lorion*, 470 U.S. 729, 743 – 744 (1985) (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)). Under the APA, a court may hold unlawful and set aside agency decisions that are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This highly deferential standard means that the court must uphold the agency's determination, even if it otherwise disagrees, so long as the agency considered all of the relevant factors

and there is a rational basis for the agency's conclusion. *Israel v. United States Dep't of Agric.*, 282 F.3d 521, 526 (7th Cir. 2002). The deck is further stacked against plaintiffs where the agency findings involve scientific or technical determinations "since these findings are presumed to be the product of agency expertise." *Franks v. Salazar*, 816 F.Supp.2d 49, 55 (D. D.C. 2011) (citing *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 103 (1983)); *see also Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 377 (1989). "In such cases, the court 'must look at the decision not as the chemist, biologist or statistician that it is qualified neither by training nor experience to be, but as a reviewing court exercising its narrowly defined duty of holding agencies to certain minimum standards of rationality.'" *Franks*, 816 F.Supp.2d at 55 (quoting *Ethyl Corp. v. EPA*, 541 F.2d 1, 36 (D.C. Cir. 1976) (en banc)).[4]

However, "deference does not mean obeisance." *Sierra Club v. Marita*, 46 F.3d 606, 619 (7th Cir. 1995). In reviewing the agency's determination, the court must pay careful attention to whether the agency based its consideration on relevant factors and determine whether there has been a clear error of judgment. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

---

[4] Contrary to Freedom's assertions, the issues before the court involve, at least, some technical expertise. The ERAD is comprised of an electric motor, primary trigger, battery power camming lobe designed to interact with the primary trigger, 9-volt batteries, and grip panels. (A.R. at 71). In classifying the ERAD, ATF was required to consider the interaction of the ERAD's components and the firearm's trigger, hammer, disconnector, and trigger sear surface. (A.R. at 74–75).

8

**III.    Discussion**

Freedom argues that ATF misapplied federal law and its own longstanding interpretation of the NFA by classifying the ERAD as a machinegun.  Specifically, Freedom asserts that the ERAD does not enable a firearm to fire more than one shot by single function of the trigger, and thus, cannot be a machinegun.  Freedom requests the court set aside ATF's classification as arbitrary and capricious.[5]

**A.    *Skidmore* Deference is Appropriate**

The parties dispute how much deference the court must give to ATF's interpretation of the NFA within the October 27, 2016 classification letter.  Freedom argues that it is only entitled to limited deference because the letter is an informal ruling.  *See Innovator Enterprises, Inc.*, 28 F.Supp.3d at 22 – 24 (applying *Skidmore* deference to ATF classification letter).  On the other hand, ATF argues that its interpretation is entitled to *Chevron* deference because ATF is charged with administering the GCA and NFA, and the classification of the ERAD reflects ATF's technical expertise.  *E.g. Modern Muzzleloading, Inc. v. Magaw*, 18 F.Supp.2d 29, 36 (D. D.C. 1998) (applying *Chevron* deference to ATF classification of rifle).

Neither side presents an entirely infallible position. With respect to Freedom's position, the fact that an agency's interpretation is informal, *alone*, does not necessarily

---

[5] In its Motion for Summary Judgment, Freedom attached several exhibits in support of its motion.  However, when reviewing the decision of an agency under the APA, the court reviews the administrative record that was before the agency at the time of the decision.  *See Florida Power & Light Co.*, 470 U.S. at 743; *see also Overton Park*, 401 U.S. at 419 – 420.  The court therefore does not consider these exhibits.

mean *Chevron* is inapplicable. *Mead*, 533 U.S. at 231 ("The fact that the tariff classification here was not a product of such formal process does not alone, therefore, bar the application of *Chevron*."). Moreover, the case on which Freedom relies—*Innovator Enterprises, Inc.*—concerned an ATF classification letter that was "just over a page long" and evidenced an "extremely light consideration" of the question at issue. 28 F.Supp.3d at 23. In the present case, ATF's classification letter was 13 pages and contained a much more thorough analysis.

ATF's position that *Chevron* applies is likewise inconclusive. It is not clear that ATF's informal classification letters are promulgated in the exercise of its authority to investigate, administer, and enforce the NFA and GCA.[6] ATF's interpretation was not a product of notice-and-comment rulemaking or a formal adjudication. *Krzalic*, 314 F.3d at 879 ("'[L]egislative rules and formal adjudications are always entitled to *Chevron* deference, while less formal pronouncements like interpretative rules and informal adjudications may or may not be entitled to *Chevron* deference.'") (quoting Richard J. Pierce, Jr., *Administrative Law Treatise* § 3.5, pp. 6 – 7 (4th ed. Supp.2003)). Even though it appears ATF has consistently promulgated rules regarding the application of its classification standards, the court is not being asked to defer to an interpretation in one of its *rules*, it is being asked to defer to an interpretation in one of its *informal classification*

---

[6] Congress delegated authority to the Attorney General to make rules and regulations concerning the GCA, *see* 18 U.S.C. § 926, and the Attorney General, in turn, delegated its authority to investigate, administer, and enforce the NFA and GCA to ATF. *See* 28 C.F.R. § 0.130(a)(1) – (2).

*letters* which only appear to bind ATF and the party who submitted the request.[7] *See Mead*, 533 U.S. at 233 (applying *Skidmore* deference to tariff classification letters, in part, because the letter did not bind third parties).

ATF's position is further weakened by the lack of consensus among courts regarding the level of deference owed to these classification letters. *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 294 F.Supp.2d 896, 900 (E.D. Ky. 2003) ("The authority is inconsistent on the question of whether ATF firearm classifications enjoy full *Chevron* deference"). Moreover, even if the court does not apply *Chevron*, the court can still defer to ATF's expertise under *Skidmore*. *Mead*, 533 U.S. at 234 – 35.

Ultimately, the *Chevron* determination in the present case is a difficult one. It is compounded by the fact that the *Chevron* "step-zero" standard is rather unclear. *See Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1157 (10th Cir. 2016) (Gorsuch, J. concurring) ("Neither, respectfully, does looking to the Supreme Court's case law supply a great deal of guidance on how to apply *Mead's* balancing test."). ATF's classification letters seem to fall into the "outer limits of the universe of less formal agency interpretations that might qualify" for *Chevron* deference that neither the Supreme Court nor the Seventh Circuit have fully defined. *Scibana*, 390 F.3d at 1000. Because of this uncertainty, coupled with the fact that the court ultimately finds that the level of deference makes no difference to the outcome in this case, the court "need not penetrate

---

[7] ATF's Handbook explains that "ATF letter rulings classifying firearms may generally be relied upon *by their recipients* as the agency's official position concerning the status of the firearms under Federal firearms laws." ATF Handbook 7.2.4.1 (emphasis added).

11

more deeply into this thicket." *Krzalic*, 314 F.3d at 879. Accordingly, the court will assume, without deciding, that the level of deference most favorable to Freedom—*Skidmore*—applies, and consider ATF's interpretation espoused in the classification letter only to the extent that it has the power to persuade. *See Mead*, 533 U.S. at 234 – 35.

### B.  ATF's Classification of the ERAD is not Arbitrary or Capricious

ATF's thirteen-page classification letter is well-reasoned and thorough. ATF explained that once a user pulls the ERAD trigger, the firearm fires continuously until either the user releases the ERAD trigger or the firearm exhausts the ammunition supply. (A.R. at 79). In firearms without the ERAD installed, the user can only reset the hammer by actually releasing pressure on the trigger; however, in firearms with the ERAD installed, the hammer is reset *automatically* by the electric motor, resulting in the user never having to release the ERAD trigger. (*Id.* at 77 – 78). Ultimately, ATF considered the relevant factors and rationally concluded that the ERAD was a machinegun because it enabled a user to fire more than one shot by single function of the trigger. (*Id.* at 79).

ATF's classification of the ERAD is consistent with its own rules, *see id.* at 630 – 32, ATF Rule 2006-2 at 1 – 3, and with case law, *see Staples*, 511 U.S. at 602 n. 1; *see also Akins*, 312 F. App'x. at 200 (accessory was properly classified as a machinegun where after a single application of the trigger, the device used an internal spring and the force of recoil to perpetuate a continuous firing sequence).

Freedom argues that ATF misapplied the "single function of the trigger" definition by making a "novel and irrelevant" distinction between the ERAD (primary) trigger and the firearm (secondary) trigger. (*See* Filing No. 24, Freedom's Brief in Support of its

12

Motion for Summary Judgment at 9). Essentially, Freedom's position is that the ERAD does not enable the user to fire more than one shot per single function of the *firearm's* trigger because the *firearm's* trigger must reset before each shot, notwithstanding the user's constant pull of the ERAD trigger. However, ATF explained that when the ERAD is installed, the firearm's trigger no longer initiates firing and merely becomes part of the firing sequence. (A.R. at 71). Thus, ATF defined the ERAD trigger, not the firearm's trigger, as the relevant "trigger" for purposes of evaluating whether more than one shot was fired per single function of the trigger under the NFA. This determination was well within ATF's expertise, and their decision is entitled to deference. *See Modern Muzzleloading, Inc.*, 18 F.Supp.2d at 37.

Moreover, ATF's determination is consistent with the law of this circuit. *See United States v. Fleischli*, 305 F.3d 643, 655 (7th Cir. 2002) (holding a trigger is a mechanism used to initiate a firing sequence) (superseded by statute on other grounds). In *Fleischli*, the defendant was convicted of two counts of possession of machineguns. *Id.* at 647. On appeal, he argued that his convictions were insufficient because the minigun he possessed did not have a trigger, and so it could not fire automatically more than one shot by a single function of the trigger. *See id.* at 654. The Seventh Circuit rejected his position, holding that a trigger is a "mechanism used to initiate a firing sequence." *Id.* at 655. In the present case, ATF's defining of the ERAD trigger as the primary trigger is squarely supported by *Fleischli*, because the ERAD trigger is the mechanism used to initiate the firing sequence. (A.R. at 71).

13

Freedom also argues that the ERAD was misclassified because it is no different from devices that ATF has previously classified as not being a machinegun.  (*See* Filing No. 24-1, Ex. A (bump fire stock device); No. 24-2, Ex. B (3MR Trigger); Filing No. 24-3, Ex. C (ALM stock)).[8]  But Freedom runs into several problems here.  First, the 3MR Trigger and the ALM stock classification letters are not a part of the administrative record, and so, the court may not consider them.  *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) (noting that the focal point of judicial review should be the administrative record in existence).  Though Freedom argues that they should have been a part of the record, Freedom has not moved to supplement the record.  *See e.g. Independent Turtle Farmers of Louisiana, Inc. v. United States*, 703 F.Supp.2d 604, 611 – 13 (W.D. La. 2010) (granting, in part, motion to supplement an inadequate administrative record).[9]

Second, the bump fire device classification letter as well as the video depicting a bump fire device (which are in the administrative record) show that bump fire devices operate differently than the ERAD.  (*See* A.R. at 47, 332 – 33).  Unlike the ERAD, bump firing requires the user to apply both forward and rearward pressure to the firearm.  (*See*

---

[8] It is worth noting that ATF's classification letter in the present case spanned thirteen pages whereas none of the other classification letters of the alleged similar devices exceeded three pages.

[9] Freedom argues that the court ought to consider the ATF classification letters notwithstanding their absence in the administrative record because consideration of the letters is necessary for effective judicial review and should have been considered by ATF, citing to the exceptions established in *Overton Park*.  *See Overton Park*, 401 U.S. at 415.  But those exceptions concern the standard of review and Freedom has already explained that arbitrary and capricious review is appropriate (as opposed to *de novo* review). (Freedom's Brief in Support at 6 – 7; Filing No. 32, Freedom's Reply at 1). Freedom's position aside, the exceptions do not apply because ATF's factual findings are not inadequate, and this is not a proceeding to enforce a nonadjudicatory action. *Overton Park*, 401 U.S. at 415.

*id.*).  Additionally, the user's trigger finger is separated from the trigger due to the recoil of the firearm between each shot whereas with the ERAD, the user never has to release the ERAD trigger.  (*See id.*).  Bump fire devices also do not contain multiple triggers, and so ATF's primary-secondary trigger classification rationale—the critical point of contention between Freedom and ATF—simply does not apply to bump fire devices.

It is true that ATF did not compare or distinguish bump fire devices in the ERAD classification letter.  But it was not required to.  Classification letters—for which there is no requirement in the law for manufacturers to seek—are informal adjudications rather than rules issued through rulemaking, and so they are not precedent.[10]  *See Porter & Dietsch, Inc. v. F.T.C.*, 605 F.2d 294, 307 n. 17 (7th Cir. 1979) ("Agency adjudications do not create industry-wide standards as rulemaking does."); *see also Neustar, Inc. v. F.C.C.*, 857 F.3d 886, 893 (D.C. Cir. 2017) (discussing informal adjudications and rulemaking).  While the court would have a more complete picture had ATF explained the differences between the devices, under arbitrary and capricious review, the court is tasked with reviewing what the agency actually did as opposed to what it could have done.  Here, ATF supplied a sufficient rationale, connecting the facts and the ultimate decision to classify the ERAD as a machinegun.  Any omission of a comparison between the bump fire devices and the ERAD does not prevent the court from reasonably tracing ATF's rationale.  *See Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (noting a court will

---

[10] The APA does not use the term "informal adjudication."  However, it is understood as a residual catch-all for agency actions that are not a product of rulemaking or on the record hearings.  *United States v. An Article of Device . . . Diapulse*, 768 F.2d 826, 829 n. 4 (7th Cir. 1985).

uphold an agency decision of less than ideal clarity so long as the agency's path may be reasonably discerned).[11]

## IV.   Conclusion

ATF concluded that the ERAD satisfied the definition of "machinegun" under the NFA because it enabled a user, by a single pull of the trigger, to initiate an automatic firing sequence that continues until either the user releases the trigger or the firearm runs out of ammunition. This conclusion was rationally supported and was not otherwise arbitrary or capricious.

Accordingly, Freedom's Motion for Summary Judgment (Filing No. 23) is **DENIED**, and ATF's Cross-Motion for Summary Judgment (Filing No. 27) is **GRANTED**. Freedom's Motion for Oral Argument (Filing No. 25) is also **DENIED**. **SO ORDERED** this 27th day of March 2018.

*[signature]*
RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record

---

[11] To be sure, the court cannot turn a blind eye to an agency's blatantly inconsistent application of its own rules. *See United States v. Diapulse Corp. of America*, 748 F.2d 56, 62 (2nd Cir. 1984) (agency cannot grant a right to one person that it denies another similarly situated). It is curious that ATF classified the bump fire device depicted in the video as not being a machinegun despite its high fire rate. (*See* A.R. at 47). Even with that in mind, however, the court cannot say that a blatant inconsistent application occurred here. Firing rate is but one factor ATF considers, and the bump fire devices are different from the ERAD in both mechanics and function. (*See id.* at 47, 333). Furthermore, as already explained, ATF's decision stands on its own: ATF fully considered the relevant aspects of the ERAD as well as the overall firing rate. Its classification is well-supported, even with this apparent inconsistency.